No. 86,969

STATE OF KANSAS, *Appellee,* v. CEDRIC E. HUNT, *Appellant.*

69 P.3d 571

Opinion filed May 30, 2003.

*Korey A. Kaul*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

GERNON, J.: Cedric E. Hunt was convicted by a jury of aggravated robbery. In this direct appeal, Hunt challenges the identification procedure which resulted in his arrest, as well as the sufficiency of the evidence which resulted in his conviction. He also objects to the trial court not instructing the jury on theft as a lesser included offense.

## Facts

A Coastal Mart convenience store was robbed by an individual with a bandana tied over the lower half of his face. The robber pulled his shirt sleeve down over his hand and pointed that hand at the clerk, which led the clerk to believe the man was armed. The clerk gave the robber five $20 bills. The robber drove away in a small, blue, four-door vehicle that did not have a license tag.

The clerk immediately called the Wichita police department, who responded immediately and dispatched a description of the vehicle and the robber. Within minutes of receiving the information, an Andover police officer observed a vehicle matching the description being driven by a man also matching the description given by the clerk. The Andover officer followed the vehicle until it stopped and then arrested the driver, Hunt.

The Andover officer then radioed the Wichita police, who drove the store clerk to Andover. The clerk immediately identified Hunt as the robber and also identified the vehicle as the one used in the robbery.

## ONE-PERSON SHOW-UP

### (A) Preservation of Issue

Hunt failed to object to the admission of the out-of-court identification at trial. Ordinarily, a defendant must object to the admission of the evidence at trial to preserve the issue on appeal. *State v. Saenz*, 271 Kan. 339, 349, 22 P.3d 151 (2001).

We have recognized three exceptions to the rule precluding review when there is a failure to properly raise the issue at trial:

"(1) [T]he newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; (2) questions are raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of a trial court may be upheld on appeal although that court may have relied on the wrong ground or assigned a wrong reason for its decision. [Citations omitted.]" *State v. Mincey*, 265 Kan. 257, 267, 963 P.2d 403 (1998).

We will analyze the issue raised in order to serve the ends of justice or to prevent a denial of a fundamental right.

### (B) Suggestive Identification

The question of whether an eyewitness identification was unnecessarily suggestive in violation of a defendant's right to due process is a mixed question of law and fact. This court reviews the factual basis of the district court's decision using a substantial competent evidence standard, but uses a de novo standard to review the legal conclusions drawn from those facts. See *State v. Shumway*, 30 Kan. App. 2d 836, Syl. ¶ 4, 50 P.3d 89 (2002).

The question of the unreliability of eyewitness identification has long been a concern for judges of all levels. Justice Brennan, writing for the majority in *United States v. Wade*, 388 U.S. 218, 228, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967), stated:

"[T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustwor-

thy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification."

Indeed, this court, in *State v. Warren*, 230 Kan. 385, 392, 635 P.2d 1236 (1981), noted:

"Closer to home is the case of Ronald Quick, who was twice tried and convicted of aggravated robbery of a liquor store in Hutchinson. At both trials two eyewitnesses positively identified defendant as the perpetrator of the crime. These two convictions were reversed for trial errors in *State v. Quick*, 226 Kan. 308, 597 P.2d 1108 (1979), and 229 Kan. 117, 621 P.2d 997 (1981). The case was dismissed by the State during the third trial after another man, who looked like the defendant, confessed to the crime."

Justice Prager, writing for this court in *Warren*, stated:

"In *State v. Ponds*, 227 Kan. 627, 608 P.2d 946 (1980), Chief Justice Schroeder states that reliability is the linchpin in determining the admissibility of identification testimony and suggests the five factors, mentioned in *Neil v. Biggers*, should be used to test the reliability of courtroom identification.

"This problem of the potential unreliability of eyewitness identification has been with us for a long time. In 1908, Charles C. Moore published *A Treatise on Facts or the Weight and Value of Evidence*. In sections 1221 through 1231, the author discusses in depth the inherent unreliability of eyewitness identification. In 1932, Edwin M. Borchard, Professor of Law of Yale University, published his book, *Convicting the Innocent, Errors of Criminal Justice*, where he discusses 65 cases where innocent people were convicted as a result of erroneous eyewitness identification. These cases occurred in 27 different states.

"In his treatise, *The Science of Judicial Proof*, p. 537 (3d ed. 1937), John Henry Wigmore states that the whole process involved in testimony going to the identity of persons calls for caution and precaution. In 3 Wigmore, *Evidence in Trials at Common Law* (rev. ed. 1970), by Professor James H. Chadbourn of Harvard University, it is stated in pages 205-06, that some of the most tragic miscarriages of justices have been due to testimonial errors in the area of eyewitness identification and the whole process therefore calls for caution.

"The problems inherent in eyewitness identification are the subject of an article by David B. Fishman and Elizabeth F. Loftus, *Expert Psychological Testimony on Eyewitness Identification*, 4 Law & Psychology Rev. 87 (Fall 1978). In her article, Dr. Loftus discusses the steps taken by the judicial establishment of Great Britain to correct the injustices resulting from mistaken identification. Astonished

by the pardons of two individuals who had been independently convicted on the basis of erroneous eyewitness identifications, the British home secretary appointed a committee to investigate this area of criminal law and police procedure. The committee, chaired by Lord Devlin, recommended that a trial judge should be required by statute (1) to direct the jury that it is not safe to convict upon eyewitness evidence unless the circumstances of the identification are exceptional or the eyewitness evidence is supported by substantial evidence of another sort; (2) to indicate to the jury the circumstances, if any, which they might regard as exceptional and the evidence, if any, which they might regard as supporting the identification; and (3) if a trial judge is unable to indicate either such circumstances or such evidence, to direct the jury to return a verdict of not guilty. The English experience and the Devlin report are discussed in Williams, *Evidence of Identification: The Devlin Report*, Cr. L. Rev. 407-422 (1976)." 230 Kan. at 390-91.

The problems inherent in any identification procedure are compounded when that procedure is a "show-up." A "show-up" is essentially one person, almost always in custody, sometimes in handcuffs, being identified by an individual who usually was the victim of a crime a short time before the identification. That was the situation in this case.

The critical element of the analysis is the reliability of the identification. *Shumway*, 30 Kan. App. 2d 836, Syl. ¶ 5. The analysis requires two steps. First, the court must determine whether the procedure used to elicit the eyewitness identification was unnecessarily suggestive. If the procedure is unnecessarily suggestive, the court continues with the second step of the analysis, evaluating the reliability of the identification under the totality of the circumstances. If there is a substantial likelihood of misidentification, the identification must be excluded from evidence. *Shumway*, 30 Kan. App. 2d 836, Syl. ¶ 6.

Kansas has adopted the five factors established by the United States Supreme Court for assessing the reliability of pretrial identifications:

" '[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness 'prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *Shumway*, 30 Kan. App. 2d at 844 (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375 [1972]).

The *Biggers* approach has been the law in Kansas and in the majority of other states. See *Holden v. State*, 602 P.2d 452, 455-56 (Alaska 1979); *State v. Bracy*, 145 Ariz. 520, 530-31, 703 P.2d 464 (1985), *cert. denied* 474 U.S. 1110 (1986); *Chism v. State*, 312 Ark. 559, 570-71, 853 S.W.2d 255 (1993); *People v. Clark*, 3 Cal. 4th 41, 135-36, 10 Cal. Rptr. 2d 554, 833 P.2d 561 (1992), *cert. denied* 507 U.S. 993 (1993); *People v. Weller*, 679 P.2d 1077, 1083 (Colo. 1984); *State v. Miller*, 202 Conn. 463, 470, 522 A.2d 249 (1987); *Younger v. State*, 496 A.2d 546, 550 (Del. 1985); *Turner v. United States*, 622 A.2d 667, 672 (D.C. 1993); *Collins v. State*, 626 So. 2d 991, 992 (Fla. Dist. App. 1993); *State v. Bennett*, 62 Hawaii 59, 67-68, 610 P.2d 502 (1980); *State v. Hoisington*, 104 Idaho 153, 161-62, 657 P.2d 17 (1983); *People v. Miller*, 254 Ill. App. 3d 997, 1003-04, 626 N.E.2d 1350 (1993); *Hamlet v. State*, 490 N.E.2d 715, 720 (Ind. 1986); *Wilson v. Com.*, 695 S.W.2d 854, 857 (Ky. 1985); *State v. Robinson*, 386 So. 2d 1374, 1377 (La. 1980); *State v. Rolls*, 599 A.2d 421, 423 (Me. 1991); *State v. Johnson*, 207 Mont. 214, 217-18, 674 P.2d 1077 (1983), *cert. denied* 467 U.S. 1215 (1984); *State v. Whittey*, 134 N.H. 310, 312, 591 A.2d 1326 (1991); *State v. Maes*, 100 N.M. 78, 82, 665 P.2d 1169 (1983); *State v. Richardson*, 328 N.C. 505, 510-11, 402 S.E.2d 401 (1991); *State v. Packineau*, 423 N.W.2d 148, 149-50 (N.D. 1988); *State v. Classen*, 285 Or. 221, 232-33, 590 P.2d 1198 (1979); *State v. Gomes*, 604 A.2d 1249, 1253 (R.I. 1992); *State v. Stewart*, 275 S.C. 447, 450, 272 S.E.2d 628 (1980); *State v. Short*, 698 S.W.2d 81, 83 (Tenn. Crim. 1985); *State v. Maupin*, 63 Wash. App. 887, 896-97, 822 P.2d 355 (1992); *State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981).

In *State v. Maybin*, 27 Kan. App. 2d 189, 203, 2 P.3d 179, *rev. denied* 269 Kan. 938 (2000), the Kansas Court of Appeals held that a roadside show-up identification procedure was unnecessarily suggestive but did not create a substantial likelihood of misidentification. Here, there are sufficient concerns to suggest that the initial identification was unduly suggestive.

Under current Kansas law, once an appellate court concludes that the initial identification may have been unduly suggestive, the

focus of appellate review shifts to a totality of the circumstances inquiry, using the *Biggers* approach.

Other states, however, use other approaches to the one-person show-up issue.

Massachusetts and New York apply a one-step analysis. If it is determined that the initial identification was unduly suggestive, then no further inquiry is made and the identification evidence is excluded. See *Commonwealth v. Johnson*, 420 Mass. 458, 650 N.E.2d 1257 (1995); *People v. Adams*, 53 N.Y.2d 241, 423 N.E.2d 379 (1981). The defendant requests that we adopt this analysis. We decline to do so.

Another method of analysis is that applied by the Utah Supreme Court in *State v. Ramirez*, 817 P.2d 774 (Utah 1991). The *Ramirez* court's analysis differs from the Kansas model by using slightly different factors to evaluate the reliability of the identification. 817 P.2d at 780-81. If the identification is deemed reliable, it is admissible even though the identification procedure is unduly suggestive. 817 P.2d at 779.

The Utah court's slight divergence from the federal analysis is based on its interpretation of the Utah Constitution and its holding in *State v. Long*, 721 P.2d 483 (Utah 1986) (requiring the use of an eyewitness identification instruction alerting the jury to five commonly accepted areas of concern for eyewitness identifications). 817 P.2d at 780. The applicable portion of the Utah Constitution provides: "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. 1, § 7.

The analytical model of the *Ramirez* holding incorporates the *Biggers* test under the totality of the circumstances, but also grafts different factors to evaluate the reliability of the identification and requires, in most cases, that the court give a cautionary instruction concerning eyewitness identification.

The Utah Supreme Court has enumerated the following five factors for evaluating the reliability of eyewitness identifications: (1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness' capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness'

identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. This last factor requires the consideration of whether the event was an ordinary one in the mind of the observer during the time it was observed and whether the race of the actor was the same as the race of the observer. 817 P.2d at 781. The *Ramirez* court noted the similarity between its factors and the *Biggers* factors, but specifically noted that its factors "more precisely define the focus of the relevant inquiry" and include suggestibility, which has no comparable emphasis in the *Biggers* factors. 817 P.2d at 781.

The first two factors are identical under either the *Biggers* approach or the *Ramirez* approach. The third *Ramirez* factor, the witness' capacity to observe the event, including his or her physical and mental acuity, differs somewhat from the *Biggers* analysis and extends the analysis of the witness' degree of attention by considering the witness' ability to perceive. The fourth *Ramirez* factor is whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion. The fifth *Ramirez* factor is the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly.

Though three of the factors differ somewhat from the *Biggers* factors, they present an approach to the identification issue which heightens, in our view, the reliability of such identification.

We accept the *Ramirez* model; however, our acceptance should not be considered as a rejection of the *Biggers* model but, rather, as a refinement in the analysis.

The problem, of course, is that juries usually attach great weight to eyewitness identification, while others involved in a trial know and other disciplines have documented that such identification is often unreliable.

We conclude that the *Ramirez* factors should be adopted as the model for examining such issues and that when requested or where such identification is a central issue in a case, a cautionary instruction regarding eyewitness identification should be given.

Even using the *Ramirez* model, we affirm the conviction here. Our conclusion is based on the following analysis, based upon the record before us.

### Opportunity to View at the Time of the Crime

The store clerk's ability to perceive the robber was unimpeded. When the robbery occurred, the robber was across the counter from the store clerk, approximately an arm's length away. There was no one else in the store to divert the store clerk's attention, so he was focused on the robber for approximately 1 minute while the robbery occurred. Although it was dark outside when the robbery occurred, the store and the parking lot were well lit and the store clerk was able to see the robber and his car clearly.

### Degree of Attention

The store clerk was completely focused on the robber. The store clerk testified that he only looked away from the robber long enough to get the money out of the cash register. The clerk looked at the robber from head to toe as he watched the robber walk out of the store, walk around the car, enter the car, and drive away. The clerk noticed that the robber removed the bandana from his face as he entered the car, so he got a glimpse of the robber's entire face. In fact, the responding officer noted the store clerk's attention to detail, testifying that the store clerk gave him an excellent description as soon as he arrived at the scene.

### Witness' Capacity to Observe

The store clerk's ability to perceive the robber was unimpeded. Hunt was identified based on visual observations. The record contains no evidence that the store clerk had a visual impairment, and there were no physical obstructions obscuring his view. Indeed, the robber was so close to the store clerk that the store clerk could have reached out and touched him.

### Spontaneity and Consistency of the Identification

The store clerk made several statements at trial that indicate that part of his description of the robber was the product of suggestion.

The store clerk testified that he described the robber as being 5'5" to 5'8" tall, but the responding officer testified that the store clerk described the robber as being 5'8" to 5'10" tall. Hunt described himself as being between 5'6" and 5'7" inches tall. The store clerk also testified that he could see the sides of the robber's face under the bandana and described the robber's sideburns and cheekbones to the responding officer. However, the responding officer testified that the store clerk did not describe either the robber's cheekbones or his sideburns. Although some of the store clerk's in-court identification of Hunt appears to be the product of suggestion, this does not invalidate the accuracy of his out-of-court identification, which was based on Hunt's pants, overall physical build, bald head, shoes, and features. The accuracy of the out-of-court identification is further bolstered by the store clerk's spontaneous identification of Hunt's car without request or encouragement from the officer.

The time elements are critical, both as to the first contact with Hunt and the first contact with the victim. The record discloses that the first contact with Hunt by a law enforcement officer came approximately 10 minutes after the description of the vehicle and robber was broadcast over the radio by the Wichita police officer who responded to the robbery report. An Andover police officer spotted a vehicle similar to the one reported by the Wichita authorities.

The second critical time came approximately 70 minutes after the robbery, when the victim was brought to the location where Hunt was being held by law enforcement officers.

## Nature of the Event

The court should consider whether the event was ordinary to the witness and whether the actor's race was the same as the witness' race. In this case, the event, an armed robbery, was far from ordinary to the store clerk. The store clerk testified that he was suspicious of something when he saw someone with a bandana over his face. There was no one else in the store to distract the store clerk from the robber, and the clerk testified that the only time he took his eyes off the robber is when he was taking the money from

the cash register. The store clerk, who is from Kenya, is the same race as Hunt.

Considering the totality of the circumstances, using the *Ramirez* factors leads to the conclusion that the one-person, show-up identification was reliable, and the trial court did not err by admitting it.

## LESSER INCLUDED OFFENSE INSTRUCTION

Hunt also contends that the trial court should have instructed the jury on theft as a lesser included offense of aggravated robbery. Hunt requested the theft instruction at trial, but the trial court denied his request, finding there were no facts presented to support the instruction.

K.S.A. 2002 Supp. 22-3414(3) provides:

"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime."

We agree with the trial court. There is simply no evidence in the record to support Hunt's assertion that the store clerk voluntarily handed the money over to Hunt or that the store clerk stole the money himself and gave it to Hunt.

Hunt also makes a reference to theft by threat. However, he does not argue that theory in his brief. An issue that is not briefed is considered abandoned. *State v. Valdez*, 266 Kan. 774, 784, 977 P.2d 242 (1999). Even if Hunt had properly briefed the issue, it is without merit. The Kansas Supreme Court has previously determined that theft by threat is not a lesser included offense of aggravated robbery. See, *e.g., State v. McCloud*, 257 Kan. 1, 15, 891 P.2d 324, *cert. denied* 516 U.S. 837 (1995); *State v. Hegwood*, 256 Kan. 901, 904, 888 P.2d 856 (1995)

## SUFFICIENCY OF THE EVIDENCE

Hunt raises the sufficiency of the evidence in the statement of the issues portion of his brief but does not include any argument to support the issue. When an issue is incidentally raised but not briefed, it is considered abandoned. *Valdez*, 266 Kan. at 784.

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned. ■