NOT DESIGNATED FOR PUBLICATION

No. 117,778

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PATRICIO BRISENO,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed November 16, 2018. Affirmed.

*David H. Matthews*, of Kansas City, for appellant.

*Michelle Fuchs McFarlane*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

PER CURIAM: In 2009, Patricio Briseno was sentenced to life in prison for first-degree premeditated murder and three counts of attempted first-degree murder. The charges arose after a passenger in an SUV fired at some boys standing outside; the State charged Briseno with being the driver.

After the Kansas Supreme Court affirmed his convictions and sentence, Briseno filed a habeas corpus claim under K.S.A. 60-1507 alleging that his trial counsel had been ineffective. The district court held an evidentiary hearing and denied the motion.

Briseno argues on appeal that his counsel was ineffective because his attorney: (1) was inexperienced in defending felony cases; (2) should have pursued an alibi defense at trial; (3) should have requested additional jury instructions; (4) inadequately handled evidence of an eyewitness identification; and (5) wasn't adequately prepared for trial. After our review of the record, we find that Briseno's attorney provided constitutionally adequate representation. We will summarize our view of the issues here, with a more detailed ruling later in this opinion.

While this trial was the attorney's first murder trial, she zealously represented Briseno. The district court found that her decision not to pursue an alibi defense was a deliberate one because the attorney thought the evidence in this case—testimony that Briseno was picking his brothers up from school when the murder happened—would have had credibility issues. That was a reasonable strategic decision, one a defense attorney can properly make.

Next, Briseno argues that his attorney should have requested a jury instruction that his "mere presence or association" with someone committing a crime doesn't necessarily mean he was involved and that merely being a gang member doesn't mean someone committed murder. We find nothing unreasonable in the attorney's failure to ask for the "mere presence or association" instruction: Briseno didn't present a defense suggesting that he was merely present when a crime was committed but wasn't involved in its commission of the crime. Instead, his defense was that he wasn't present at all. Since Briseno's defense wasn't based on his having been present but a mere bystander, the attorney's failure to ask for this instruction wasn't unreasonable. And gang membership was the alleged motive for the shooting, so it was a central issue that the jury had to consider.

As for Briseno's claim regarding the eyewitness-identification testimony of one key witness, his attorney did a thorough cross-examination of the witness. And Briseno's general claims that his attorney didn't spend enough time preparing for trial doesn't take us anywhere. Even if his attorney's preparation was inadequate (which hasn't been shown), Briseno also would have to show that this impacted the trial in some significant way. He has not done so.

In short, Briseno did not show that his trial counsel's representation fell below an objective standard of reasonableness. Nor did he show that any inadequacy in the attorney's representation materially hurt his defense. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of the criminal case against Briseno were set out in the Kansas Supreme Court's 2014 decision in his direct appeal. *State v. Briseno*, 299 Kan. 877, 879-81, 326 P.3d 1074 (2014). We will briefly recount them here.

In 2009, a group of four teenage boys were gathered in front of a Kansas City, Kansas, home when a black SUV approached the house and a person in the SUV started shooting. One of the bullets fired from the SUV struck and killed 13-year-old Ricardo Zamora. Another bullet hit one of the other boys; he recovered. The two other boys weren't hit.

Briseno and his codefendant, Juan Lopez, were tried together in October 2009. Lopez was acquitted, but the jury convicted Briseno of one count of first-degree murder and three counts of attempted first-degree murder.

3

The Kansas Supreme Court affirmed Briseno's convictions in 2014. *Briseno*, 299 Kan. at 889. Briseno then filed a habeas corpus claim under K.S.A. 60-1507 arguing that his trial had been unfair because his retained attorney, Jean Ann Uvodich, had been ineffective. The claims specific to this appeal are that Uvodich was ineffective because: (1) she didn't file a motion in limine to prevent the jury from hearing evidence of an eyewitness identification of Briseno; (2) she "had very little experience in conducting jury trials prior to representing defendant for First Degree Murder"; (4) she was inadequately prepared for trial; (5) she "failed to investigate alibi witnesses that could have testified that Petitioner was at another location at the time of the murder"; and (6) she failed to request jury instructions "limiting the jury's use of evidence relating to gang membership" and "instruct[ing] the jury that 'mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor.'"

The district court held an evidentiary hearing, and we'll provide a brief overview of that testimony here. We will add additional details as we discuss the specific claims presented on appeal.

Briseno called five witnesses: Briseno; Briseno's brothers, Ignacio and Jose; Debera Erickson, the attorney who represented codefendant Juan Lopez at trial; and Gayle Kershaw, an employee of the county sheriff's department. Briseno said that Uvodich's consultation with him had been insufficient and that he had told her that he had been picking his brothers up from school when the murder took place. Ignacio and Jose testified that Briseno had, indeed, picked them up from school that day, in neighboring Johnson County, at about the time of the murder. Erickson testified about some perceived deficiencies in Uvodich's representation and experience. Kershaw testified about the dates and times jail records showed Uvodich had met with Briseno before trial.

4

The State called Uvodich. She testified about her experience and the decisions she made about how to approach Briseno's defense.

The district court denied Briseno's motion in a 27-page opinion. The court concluded that Uvodich had provided an adequate defense under constitutional standards. The court separately concluded that even if some of the points Briseno complained about had been below objective standards for criminal representation, there was no prejudice to Briseno.

Briseno has appealed to our court.

ANALYSIS

When the district court has conducted an evidentiary hearing on a habeas claim under K.S.A. 60-1507, as it did here, we apply a two-part standard of review, asking (1) whether the district court's factual findings are supported by substantial evidence and (2) whether those findings are sufficient to support the district court's conclusions of law. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018); see *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007). Substantial evidence is evidence that a reasonable person would find sufficient to support a conclusion. *White*, 308 Kan. at 504. We owe no deference to the district court's conclusions of law, so we must independently determine whether habeas relief should have been granted based on the facts found by the district court that are supported by substantial evidence. 308 Kan. at 504; see *Bellamy*, 285 Kan. at 354-55.

Under K.S.A. 2017 Supp. 60-1507(b), a district court shall set aside a defendant's conviction if, among other reasons, "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." One such constitutional right is the Sixth Amendment's right to counsel, which

5

includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 669, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Thus, ineffective assistance of counsel is a denial or infringement of constitutional rights that renders a judgment vulnerable to collateral attack (that is, an action separate from the original case or direct appeal). See K.S.A. 2017 Supp. 60-1507(b).

When a defendant seeks to set aside the result of a criminal trial on the ground that the defense attorney provided inadequate assistance, the defendant has the burden to show (1) that the attorney's work was below minimum standards and thus was constitutionally deficient and (2) that the attorney's substandard work prejudiced the defense. *Mattox v. State*, 293 Kan. 723, Syl. ¶ 1, 267 P.3d 746 (2011). Since these tests were initially outlined in *Strickland*, courts call them the *Strickland* standards; the two parts of the test are commonly called the performance prong and the prejudice prong. 293 Kan. at 725-26. To meet the prejudice prong, Briseno has to show that but for his attorney's deficient performance, there's a reasonable probability that the trial's outcome would have been different. *State v. Cheatham*, 296 Kan. 417, Syl. ¶ 6, 292 P.3d 318 (2013). When reviewing claims of ineffective assistance of counsel, "judicial scrutiny of counsel's performance is highly deferential, and a strong presumption exists that counsel's conduct is reasonable." *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (2013).

Briseno argues in this appeal that his trial counsel was ineffective in five specific ways that prejudiced him at trial. We discuss each one separately.

*Uvodich's Lack of Felony-Trial Experience*

Briseno begins by arguing that Uvodich wasn't competent to undertake his case because of her limited experience in trying felony cases. Uvodich testified that she had tried five or six jury trials as a defense attorney before she was retained by Briseno's

family. Of those trials, none were felony cases but she was the lead defense attorney in each one. Briseno argues that Uvodich wasn't competent to represent him during his murder trial because she hadn't defended a murder trial before she tried Briseno's case.

The problem with this claim is that just because Uvodich hadn't defended a murder charge in a jury trial before doesn't mean that she provided deficient representation. Briseno still must point to specific things that Uvodich did or failed to do that were below minimum standards.

Briseno compares his case to one our court handled in the past, *Larson v. State*, No. 90,603, 2004 WL 1443901 (Kan. App. 2004) (unpublished opinion). In that case, Larson claimed he was prejudiced by the fact that his jury trial was the first his attorney had tried. Our court rejected that claim, explaining that Larson's attorney "obtained assistance and guidance from senior members of his firm. He secured several possible plea offers from the State, filed several pretrial motions, made objections, effectively cross examined witnesses, and called several witnesses on his client's behalf. He made a coherent and logical closing argument." 2004 WL 1443901, at *5. Our court concluded that Larson hadn't been prejudiced simply because it had been his attorney's first jury trial. 2004 WL 1443901, at *5.

Briseno says that unlike the attorney in *Larson*, Uvodich wasn't assisted by other attorneys in preparing for the trial. It's true that Uvodich didn't testify that she received aid from other attorneys, but *Larson* doesn't suggest that failing to seek guidance from more experienced attorneys is a dispositive factor in proving ineffective assistance. Instead of focusing solely on whether Larson's attorney had help preparing for trial, it considered the other steps that the attorney took in preparing. In this regard, the assistance Uvodich gave Briseno is similar to the assistance Larson received. Like Larson's attorney, Uvodich filed pretrial motions to keep evidence out of the trial and responded to the State's pretrial motions. She made objections at trial and extensively cross-examined the State's witnesses.

7

And she made coherent and logical closing arguments in which she fully explained her theories of defense and pointed out weaknesses in the State's case.

Briseno also notes that Uvodich didn't have the experience required in the Wyandotte County District Court to be appointed to represent an indigent defendant in a similar case. Here, though, Briseno's family retained Uvodich to represent him rather than asking the court to appoint counsel for him on the basis that he couldn't afford to hire an attorney. It's certainly appropriate for the court to set standards for appointed counsel to make sure that those who are appointed are well qualified for the specific type of case. But that doesn't mean that a defendant who hires counsel without the same qualifications or experience will automatically be entitled to a new trial simply based on the attorney's lack of some past experience. Briseno must show that Uvodich actually failed to provide adequate representation in some respect. We move on, then, to Briseno's specific claims of deficient performance.

*Failure to Present Witnesses to Support an Alibi Defense*

Briseno claims Uvodich's representation was deficient because she didn't pursue a potential alibi defense. Specifically, Briseno contends that Uvodich's failure to investigate the potential alibi defense amounted to ineffective assistance of counsel because the evidence "should have [been] submitted to the jury that [Briseno] could not have been involved [in the murder] because he was picking up his siblings from school," evidence that "may have resulted in an acquittal." The State counters that Uvodich's decision not to pursue an alibi defense was a reasonable strategic decision.

At the evidentiary hearing on Briseno's habeas claim, Briseno said that he had originally told Detective Willie Jenkins that he had picked up both his brothers and his sister, but later said he had only picked up his brothers. The State presented evidence at Briseno's murder trial that his sister hadn't been at school that day at all, which undercut

8

the statement Briseno had initially given to Jenkins. Briseno also testified at the habeas hearing that during the investigation, he had told Uvodich that he had been picking up his brothers when the murder happened but that she never discussed the possibility of his brothers testifying as witnesses.

Both of Briseno's brothers, Ignacio and Jose, testified at the hearing. Ignacio, who was 11 years old at the time of the murder, told the court that his brother had picked both him and Jose up from school on the day of the murder. Ignacio denied having ever met Uvodich or having been "questioned by law enforcement about [his] presence with [his] brother on that day." Jose, who was 13 years old at the time of the murder, also said his brother had picked him up from school on the day of the murder and that he had never spoken with Uvodich.

Uvodich was asked during her testimony if she had ever discussed a potential alibi defense with Briseno. She emphasized that Briseno had never personally protested to her that he couldn't have committed the crime because he had been on an innocent errand at the time:

> "You know[,] it was interesting because when I met with the family, they talked about that my client had been taking the kids to school at that time. However, when I met with my client, he never suggested that he was anywhere taking or picking his siblings up from school and the police reports and the investigation reports . . . show that the children had missed school that day, so it is not like I walked into a room to discuss with my client and he was, like, '[O]h, my [G]od, I can't believe they're charging me with this? I was clearly at school picking up my brother.' That is not at all what I heard and . . . I wanted to be sure that we weren't suborning any kind of perjury and that we weren't going to put the credibility of my witnesses on the line . . . ."

Later during her testimony, Uvodich again emphasized that Briseno never suggested to her that he had been picking up his brothers when the murder took place.

9

Uvodich admitted that she didn't speak with Briseno's brothers about the matter. But she also testified that neither Briseno nor his family ever approached her and asked her to consider the alibi-witness testimony. Likewise, Uvodich said that she didn't recall Briseno or his family asking that she speak with Briseno's brothers about whether Briseno was, in fact, picking them up from school when the murder took place. When asked whether she had any concerns regarding a potential alibi defense of Briseno picking up his brothers from school, Uvodich explained that her "concerns came down to . . . credibility and whether [she] would be able to present an alibi defense that was truthful . . . especially after reviewing various records." She concluded by saying she felt presenting an alibi defense could be potentially damaging to Briseno because of credibility issues.

Uvodich also described her theories of defense for trial and explained how the alibi defense didn't fit with her overall trial strategy. Although Uvodich said "there is a possibility I should have focused more on [the potential alibi defense]," she explained how that wasn't the major focus or strategy of her defense and "felt that [pursuing that defense] could be damaging to [Briseno] because of credibility issues." Rather, she described her defense theories as lack of identification, lack of evidence regarding Briseno's role in the murder, whether Briseno's vehicle was the vehicle involved, and the fact that the medical examiner testified that the fatal shot could not have come from the street. When describing her preparation for the trial, Uvodich emphasized her attempting to create reasonable doubt, saying that she

> "basically took the evidence that [she] had and was trying very diligently to make sure that because I believed that we had a very good opportunity to provide reasonable doubt and that reasonable doubt had to do with a lot of things, including the vehicle, including . . . the lack of identification, lack of anybody's fingerprints on these bullets, all of the things that were missing."

10

The district court held that Uvodich had provided effective counsel and that her decision to not pursue the potential alibi defense had been a strategic decision made so as not to jeopardize the credibility of the defense case. The court heard the testimony of Briseno's brothers, Jose and Ignacio, and found that testimony "remarkably similar," suggesting that it was too similar to have been truthful. The court also noted questions about Briseno's credibility on this subject and that Briseno's mother and sister didn't testify at the habeas hearing. The court concluded that Uvodich had done some investigation of the alibi defense but "had concerns about credibility and possible untruthful testimony." The court also found that she had "legitimate concerns about the truthfulness of her client's initial statements to the police," apparently referring to his initial statement (disproven by the State) that he had also picked up his sister that day. The court concluded that her failure to call the brothers to testify at trial didn't constitute deficient performance.

In some cases, an attorney's failure to investigate, contact, or provide notice of alibi witnesses has been found to be ineffective assistance of counsel. See, e.g., *State v. James*, 31 Kan. App. 2d 548, 553-55, 67 P.3d 857 (2003); *State v. Thomas*, 26 Kan. App. 2d 728, 731-32, 993 P.2d 1249 (1999), *aff'd* 270 Kan. 17, 11 P.3d 1171 (2000); *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135 (1997). But when a defendant's trial counsel conducts a thorough investigation of the facts, witnesses, and law and concludes, as a matter of strategy, not to call an alibi witness, the representation is presumed to be effective. See *Shumway*, 48 Kan. App. 2d at 499-500, 512-13.

We note that the facts in *James* and *Sanford* are different from those here. In *James*, "appellant testified he repeatedly asked [his attorney] to contact his divorce attorney . . . as to possib[le] theories of defense." 31 Kan. App. 2d at 554. Here, on the other hand, Uvodich testified that Briseno never asked her to investigate a potential alibi defense of picking up his brothers. Also, it appears that the attorney in *James* didn't make a strategic decision to not pursue an alibi defense. Rather, the attorney simply reasoned

11

that the potential witness didn't want to testify. 31 Kan. App. 2d at 553. That's not why Uvodich didn't pursue Briseno's potential alibi defense. Instead, her decision was informed by her concern that the testimony could have credibility problems. The same goes for *Sanford*, where—unlike Uvodich's strategic decision not to pursue an alibi defense—there was no indication that Sanford's attorney made a deliberate decision to not investigate the potential alibi witnesses. See *Sanford*, 24 Kan. App. 2d at 525.

Here, the district court that heard the testimony of Briseno and his brothers regarding the alibi defense concluded that Uvodich had "legitimate concerns about the truthfulness of her client's initial statements to police" and "concerns about credibility and possible untruthful testimony" regarding the alibi defense. The court found that Uvodich made a conscious choice not to pursue the alibi defense. As she testified in the evidentiary hearing, she "felt that it could be damaging to [Briseno] because of credibility issues." The district court's conclusion that Uvodich knew about the potential alibi witnesses but made a conscious choice to not pursue that line of defense is supported by the evidence.

In addition, Uvodich used the State's witnesses to pursue a middle ground here, presenting some information about the potential alibi to the jury without presenting defense witnesses whose credibility could be seriously challenged. At trial, Detective Jenkins testified for the State that Briseno said he had picked up his brothers and sister from school on the day of the murder. Jenkins also said that Briseno "later recanted . . . and said that his sister got out [of school] early and that his mom had picked her up." On cross-examination, Jenkins said that "[Briseno] didn't say he picked [his sister] up" but that "he normally picks his sister up at 2:40." Further, during both opening and closing arguments, Uvodich addressed the fact that Briseno had told Jenkins that he was picking up his brothers at the time of the murder. While that claim could have been stronger had Jose and Ignacio given credible supporting testimony, it also could have evaporated had their

12

credibility been successfully challenged. We agree with the district court that Uvodich's decision was a reasonable strategic choice, not deficient representation.

*Failure to Request Jury Instructions*

Briseno claims that Uvodich rendered ineffective assistance of counsel when she failed to ask for two jury instructions: (1) a jury instruction on mere presence or association and (2) a jury instruction limiting the jury's consideration of Briseno's gang affiliation.

We first note that Briseno's argument on this issue is limited to a single paragraph citing a single case:

> "In addition to her failure to pursue an alibi claim, Uvodich also failed to ask for important jury instructions to limit evidence of gang affiliation and on mere presence [or] association. The Court in *State v. Llamas* said, 'The "mere presence" or association language of an aiding in abetting instruction should be given if and only if that is a theory of the defense.' *State v. Llamas*, 296 Kan. 246 (2013). In this case, the Defendant argued alibi, misidentification and that the co-defendant was the shooter. However, that would not prohibit him from making the argument that if the jury found that Appellant was driving the vehicle that he is not guilty simply because of mere association of the shooter. Therefore, it was an error for Ms. Uvodich not to request such an instruction. Similarly, failure to request an instruction limiting the gang membership was an error which prejudiced [Briseno]."

While Briseno has raised two potential jury instructions, he has not provided a particularly well-developed argument about the need for either of them, let alone provide authority for the proposition that an attorney's failure to request them constitutes constitutionally inadequate representation. We could reject his claims about jury instructions for the failure to adequately brief them. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) (reciting the rule that "[w]hen a litigant fails to

13

adequately brief an issue it is deemed abandoned"). Because of the serious nature of the case, we will nonetheless discuss these potential instructions.

The first instruction Briseno says Uvodich should have requested is that mere presence or association with another person who commits a crime doesn't constitute evidence that a person was aiding or abetting the other person in committing that crime. See *State v. Llamas*, 298 Kan. 246, 258-59, 311 P.3d 399 (2013). The district court concluded that Uvodich didn't err in not requesting a mere presence or association jury instruction because Briseno didn't present a defense based on the theory that he had merely been present in the car when shots were fired so "such an instruction would not have been either required or requested." The court supported its conclusion by explaining that

> "the evidence was that Briseno was the driver of the vehicle from which the fatal shots were fired [and] the defense presented was misidentification/victim killed by shots not fired from vehicle/alibi. Briseno did not testify at trial. He did not claim he was present and driving but did not know his passenger was going to shoot at anyone."

The *Llamas* case Briseno cites is consistent with the trial court's ruling. In it, our Supreme Court said that it would be good practice to include mere association or presence language in a jury instruction "when a defense is based on the theory that a defendant was merely present and did not actively aid or abet a crime." 298 Kan. at 261. But Briseno didn't present such a defense—and even now he contends he was picking up his brothers, not driving the car from which shots were fired. Since Briseno didn't present a mere presence or association defense, Uvodich didn't err by not requesting mere presence or association language in the jury instructions.

Briseno also suggests, albeit very briefly, that Uvodich should have requested "an instruction limiting the gang membership." We presume that Briseno's claim is that

14

Uvodich should have asked for an instruction limiting the jury's consideration of evidence that he was a member of a specific gang that was said to be in conflict with another gang whose members included the boys who were fired upon. The district court noted that a pretrial hearing was held regarding gang-related evidence, determining that it was relevant and what evidence could be presented. The court also noted that "all of the parties were acutely aware that gang membership and activities were the motivating factor in this homicide."

It is well established that gang-affiliation evidence is admissible when relevant; evidence of motive in a murder case is certainly relevant. See *State v. Molina*, 299 Kan. 651, 656-57, 325 P.3d 1142 (2014); *State v. Peppers*, 294 Kan. 377, 390, 276 P.3d 148 (2012); *State v. Jamison*, 269 Kan. 564, 568, 7 P.3d 1204 (2000); *Beard v. State*, No. 116,697, 2018 WL 911394, at *2-3 (Kan. App. 2018) (unpublished opinion), *rev. denied* October 30, 2018. And a limiting instruction telling the jury that evidence of gang affiliation may only be considered for limited purposes is not required unless requested and appropriate. *Molina*, 299 Kan. at 656. Here, the jury might have been told not to consider the gang affiliation of Briseno and his codefendant on any issue other than their potential motives in these crimes. But everyone understood that was exactly why the gang-membership evidence was presented to the jury. We agree with the district court that Briseno has not shown how a limiting instruction on the consideration of gang affiliation "would have . . . assisted the jury" or "how he was prejudiced" for the lack of such an instruction. Uvodich's failure to request this instruction didn't constitute inadequate representation.

*Challenging Key Eyewitness-Identification Evidence*

One of the most important witnesses in the murder trial was Patrick Fischer. He had been delivering mail in the neighborhood when the shots were fired. His testimony was especially important because he was present and not connected with either gang.

15

Before the shooting, Fischer observed a black SUV driving through. He told police later that day that the driver was a young, Hispanic male with facial hair and that the vehicle had four occupants. After the vehicle had passed behind him, he heard gunshots, ducked behind a wall, and eventually looked back to see a gun sticking out of the vehicle's rear passenger window. At a police photo lineup a few days later, he identified Briseno as the driver with 70% certainty. But when he testified at a preliminary hearing in the case, he wasn't able to identify Briseno in the courtroom.

Before trial, Uvodich filed a motion to suppress any identification testimony from Fischer. She based the motion on several factors, suggesting that the police photo lineup had been biased and also noting Fischer's later inability to identify Briseno at a court hearing. But the district court denied her motion, leaving Fischer as an available witness for trial.

At the trial, Uvodich was surprised when Fischer testified that he was "sure" and "certain" that Briseno was, indeed, the driver. Briseno argues that her representation of him was inadequate in challenging Fischer's testimony. He contends that her cross-examination was inadequate (saying that it didn't cover all the factors set out in *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 [2003], that a court uses to determine the admissibility of eyewitness testimony) and that she failed to file a pretrial motion to prevent the testimony. The district court rejected these claims, noting that Uvodich had filed a motion to suppress Fischer's testimony and that she extensively cross-examined him.

We can easily dismiss Briseno's claim that Uvodich should have filed another motion on this issue. On appeal, Briseno's argument on that issue is limited to one sentence: "She did not file a motion to suppress identification and did not pursue an expert in identification before trial and she did not adequately cross examine Mr. Fischer

16

using the factors in *Hunt*." While Briseno makes additional argument about why the cross-examination wasn't sufficient, that's all he provides on appeal about why Uvodich's representation was inadequate for the failure to file further motions to prevent Fischer's testimony or the failure to hire an expert to testify about why eyewitnesses are sometimes wrong. That's insufficient to preserve these issues on appeal. See *Williams*, 298 Kan. at 1083. In addition, as the trial court noted, Uvodich *did* file a motion to keep Fischer's identification testimony out of the trial. That motion, which argued that the police photo lineup had been unduly suggestive and that Fischer's testimony was unreliable, was denied. There's no reason to believe that a second motion would have been more successful, and Briseno gives us no legal basis on which to conclude that the district court should have kept Fischer from testifying to the jury.

We turn, then, to Briseno's complaint that Uvodich didn't adequately cross-examine Fischer. As Briseno notes on appeal, Kansas courts traditionally look at eight factors, first announced in the *Hunt* case, when determining whether eyewitness testimony should be admitted at trial:

> "(1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness' capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. This last factor requires the consideration of whether the event was an ordinary one in the mind of the observer during the time it was observed and whether the race of the actor was the same as the race of the observer. [Citation omitted.]" 275 Kan. at 817-18.

Briseno argues that Uvodich "did not adequately cross examine Mr. Fischer using the factors in *Hunt*." But the *Hunt* factors were given to guide courts in deciding whether

17

police had been unduly suggestive and led the witness to identify the suspect, not as a guide to cross-examination of an eyewitness at trial.

From our review of the transcript, we agree with the district court that Uvodich competently cross-examined Fischer. During her cross-examination, Fischer confirmed that he had initially told officers that the only facial feature of the driver that he could see "was that he had facial hair." Then, based on the statement he gave police at the time of the photo lineup, Fischer confirmed that he had identified Briseno as the driver of the vehicle with only 70% certainly. Uvodich went on to thoroughly question Fischer about the discrepancy between Fischer's testimony at the preliminary hearing—when he said he couldn't identify Briseno in the courtroom—and his testimony at trial. She also asked Fischer about his statement to the police that the vehicle involved in the shooting was a solid black SUV, which differed from his trial testimony that the SUV was two-toned.

*General Trial Preparation*

Briseno's final claim is that Uvodich's performance fell below an objective standard of reasonableness because she didn't adequately prepare for trial. Like his earlier claim that Uvodich didn't have enough experience to try a jury-trial murder case, this claim fails because Briseno never shows how any lack of preparation led to any act or inaction by Uvodich that fell below objectively reasonable standards.

First, Briseno says he only met with Uvodich four or five times for 15 to 20 minutes each time, an insufficient time for an attorney to discuss plea options. But at his hearing, Briseno admitted that "[Uvodich] told [him] the only way that [the State was] going to offer me a plea is if I tell them what I know." He said he turned down that possibility because he didn't know anything. Uvodich also testified that she discussed the possibility of a plea offer if Briseno had been willing to "sit down and give them all of the information that he had in the case," but that "[Briseno] did not want to consider any plea offers." Briseno doesn't point

18

to any other evidence showing that the State even considered the possibility of a plea deal with Briseno.

This was a case in which there were two defendants—Briseno, the alleged driver, and Lopez, the alleged shooter. It might well have been the case that the State would have been willing to make a deal with one of the defendants if he had agreed to testify truthfully and had information that could be used against the other. But Briseno deliberately chose to forego the chance to reach a plea agreement with the State, so there was no reason for Uvodich to spend additional time with him discussing potential plea bargains.

Briseno also argues that he didn't have enough time with Uvodich to discuss trial options, different types of defenses, the evidence against Briseno, or Briseno's rights. Uvodich's time with Briseno seems small, but time spent at the courthouse before or after hearings (and not at the jail) may not have been included.

But Briseno admitted that he and Uvodich discussed the motions she intended to file and that they talked about the evidence against him. Uvodich's testimony and the trial transcript supports the district court's finding that she was adequately prepared. She said she reviewed all of the discovery and "discussed the testimony of various witnesses" with Briseno. Uvodich also discussed how Briseno told her that he wanted to go to trial but didn't want to testify in his own defense and how she spent time with Briseno to prepare him for trial. Briseno has not shown any significant thing that Uvodich would have done differently with additional preparation or additional time spent meeting with him.

We affirm the district court's judgment.